Charles H. Carper v. Commissioner.
Carper v. Commissioner
Docket No. 84865.
United States Tax Court
T.C. Memo 1962-35; 1962 Tax Ct. Memo LEXIS 273; 21 T.C.M. (CCH) 168; T.C.M. (RIA) 62035; February 23, 1962
LeRoy Katz, Esq., for the petitioner. W. Ralph Musgrove, Esq., for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: The respondent determined the following deficiencies in income tax and additions to tax: Additions to Tax
Income
Sec.
Sec. 294
Sec. 6653(b)
Year
Tax Deficiency
Sec. 293(b) [1]
294(d)(2)
(d)(1)(A)
I.R.C. 1954
1947
$ 3,012.80
$ 1,506.40
$ 180.77
$ 271.15
1948
877.80
438.90
58.13
87.19
1949
12,427.51
6,213.76
747.88
1,121.83
1950
930.86
465.43
61.24
1951
6,543.90
6,955.49
823.52
1952
33,822.67
16,911.34
2,503.88
1953
16,773.64
8,386.82
1,060.94
1954
31,881.24
1,828.39
$15,940.62
1955
21,653.23
10,826.62
*274 The issues are (1) whether the understatements of petitioner's income for the years 1947 through 1955 as determined by the respondent are correct; (2) whether the petitioner is liable for the 50 percent addition to tax for the years 1947 through 1955 within the meaning of sections 293(b) of the Internal Revenue Code of 1939 and 6653(b) of the Internal Revenue Code of 1954; (3) whether any of the years 1947 through 1955 are barred by the statute of limitations; (4) whether the petitioner omitted from gross income in the years 1954 and 1955 amounts properly includible therein in excess of 25 percent of the gross income reported; (5) whether the petitioner is liable for the additions to tax under section 294(d)(2) for the years 1950 through 1954 and section 294(d)(1)(A) for the years 1947 through 1949. Respondent has conceded the additions to tax under section 294(d)(2) for the years 1947, 1948 and 1949. Findings of Fact Some of the facts were stipulated and they are herein included by this reference. Charles H. Carper, hereinafter called the petitioner, *275 is a resident of White Sulphur Springs, West Virginia. He filed his individual income tax return for 1947 with the then collector of internal revenue at Richmond, Virginia, and for 1952 with the district director of internal revenue at Richmond, Virginia. He filed his individual income tax returns for 1948, 1949, 1950 and 1951 with the then collector of internal revenue at Parkersburg, West Virginia, and for 1953, 1954 and 1955 with the district director of internal revenue at Parkersburg, West Virginia. Petitioner received no formal education. From 1921 to 1932 the petitioner was engaged in the illegal production of whiskey. In 1932 he constructed 11 tourist cabins at Crows, Virginia, and in 1938 he started construction of 40 additional tourist cabins (called the Travel Town Tourist Camp) at White Sulphur Springs, West Virginia. In both instances the petitioner used lumber available at a family-owned sawmill. Petitioner operated these tourist cabins through the year 1947. Subsequent to 1947 the petitioner sold the 11 cabins at Crows, Virginia, retaining in operation the 40 tourist cabins at White Sulphur Springs. In 1949 petitioner constructed a motel of 14 units, hereinafter called *276 the Tea Room Motel, on the same property where the Travel Town Tourist Camp was located. The Tea Room Motel was of cinder block construction and much of the work was done by petitioner without any plans or specifications. In September 1951 the petitioner purchased a parcel of real estate for $27,500 in the White Sulphur Springs area and started construction of a 40-unit cinder block motel called the City Motel. Petitioner supervised the construction and did some of the work himself. Old lumber from wrecked tourist cabins was used in the new motel. The 40 units of the City Motel were completed in July 1952. In 1953 the petitioner started construction of a two-story, 20-unit cinder block addition to the City Motel. Petitioner supervised the construction and also assisted in some of the work. In 1954 petitioner started construction of a 24-unit cinder block motel called the All State Motel. This motel was faced with brick in the front and in its construction the petitioner used materials remaining from his City Motel construction. All of the motels constructed by petitioner had concrete flooring. The following cost were incurred by petitioner after 1955: Year
Motel
Item
Amount
1956
City Motel
Shrubbery
$ 375.00
Asphalt paving
1,525.00
1957
All State
Awnings
2,000.00
Heating system
642.90
Asphalt paving
1,400.00
1958
City Motel
Front porch
500.00
Total
$6,442.90
*277 Petitioner's books were kept on a single entry basis by Elsie Steele, who had received no formal training in keeping books. Weekly entries of motel rental receipts were made in the books. Expenses and other amounts paid out were similarly recorded on a weekly basis. Guest registration cards, cash register tapes and other supporting information for the book entries were destroyed after 10 days. Petitioner's income tax returns for the years 1947 through 1952 were prepared by a firm of certified public accountants, and his returns for the years 1953, 1954 and 1955 were prepared by another person who was employed in a local business establishment as an auditor. In preparing petitioner's returns, the accounting firm found it necessary to obtain further information from third party sources and to supplement petitioner's books by a "receipts and disbursements" method. The accounting firm obtained duplicate deposit slips and savings account information from banks, and it also made inquiries with third parties concerning petitioner's purchases. When the firm of certified public accountants was preparing petitioner's 1952 income tax return it was found necessary, in view of petitioner's *278 large expenditures for motel construction in 1952, to file an amended 1951 income tax return which showed an adjusted gross income of $23,237.92. The income tax return originally filed for 1951 showed an adjusted gross income of $1,333.16. Petitioner sometimes made deposits of motel rental receipts in his savings account. Petitioner paid most of the motel construction costs in cash. A portion of the daily motel rental receipts was used by petitioner to pay construction costs on work in progress and other operating expenses. Petitioner actually managed the City Motel from the time of its opening in July 1952, and the rental income from this motel was entered on the books by the bookkeeper from a cash slip supplied by the petitioner. In 1953 an action was brought against petitioner in the Circuit Court of Greenbrier County, West Virginia by the vendor of the City Motel property to have the sale rescinded on the ground that petitioner had failed to construct a gasoline station on the property. As an alternative prayer for relief the complaint asked that the deed to the property be reformed to correct certain purported alterations made therein by the petitioner. The complaint was dismissed *279 in 1955 by the Circuit Court. It is stipulated that the petitioner made the following expenditures in connection with the Tuckwiller lot upon which the City Motel is situated: 1953, $500; 1954, $1,422; and 1955, $1,000. For the years 1937 through 1944 the respondent had determined deficiencies in petitioner's income tax and 50 percent additions to tax based upon the net worth plus nondeductible expenditures method. In 1947 the petitioner executed Form 870 in which he agreed to the assessment and collection of deficiencies and 50 percent additions to tax for each of the years 1937 through 1944. The respondent's determination of deficiencies for those years was based upon the net worth plus nondeductible expenditures method. A revenue agent first contacted petitioner on June 18, 1956 in connection with the present case and arranged to start are audit on the following morning. It is stipulated that petitioner "made a visit" to his safety deposit box at 9:00 a.m. on June 19, 1956, and that he had rented a safety deposit box continuously since January 15, 1948. Petitioner then prepared and submitted to the revenue agent a cash on hand statement covering a period of several years. The *280 statement showed cash on hand in the amount of $5,000 as of December 31, 1952 and $1,000 for each of the years 1948 through 1955. Petitioner asked to reexamine the statement and destroyed it. Throughout the investigation petitioner refused to reveal his cash on hand. Petitioner was evasive and uncooperative at various times during the period of audit. Petitioner filed declarations of estimated tax for the years 1950 through 1954 but failed to file any declarations of estimated tax for the years 1947 through 1949. Petitioner reported the following amounts of adjusted gross income in his income tax returns filed for the years 1947 through 1955: Year
Amount Reported
1947
[1,570.01)
1948
3,269.48
1949
2,288.25
1950
3,467.65
1951 (amended return)
23,237.92
1952
26,950.48
1953
12,366.47
1954 (amended return)
584.06
1955
3,124.37
Respondent, by using the net worth plus nondeductible expenditures method, computed the petitioner's unreported adjusted gross income for the years 1947 through 1955. We set forth the net worth statement as revised by respondent on brief. In general this shows less unreported income than is shown by the net worth statement *281 attached to the 90-day letter. However, in two of the years, 1951 and 1954, it shows more. Since respondent did not seek increased deficiencies, any deficiency for said years cannot exceed the amount shown in the statutory notice of deficiency. [2]
COMPUTATION OF INCOME BY NET WORTH PLUS NONDEDUCTIBLE
EXPENDITURES METHOD
ASSETS
12-31-46
12-31-47
12-31-48
Cash on hand
$ 7,874.07
$ 12,977.26
$ 14,258.93
Cash in Bank: Citizens National Bank -
47.17 *
1,629.77 *
3,876.72 *
Checking
Citizens National Bank -
135.92 *
137.27 *
138.65 *
Savings
Bank of White Sulphur
167.37 *
169.04 *
170.72 *
Springs - Savings
United States Savings Bonds
75,430.00 *
79,180.00 *
79,180.00 *
Notes Receivable
0
6,000.00 *
17,700.00 *
Automobiles
500.00 *
500.00 *
900.00 *
Nondepreciable real estate
8,198.73 *
7,898.73 *
2,842.25 *
Depreciable real estate: Mountain Tavern - Buildings
1,782.78 *
Crows - Buildings
12,926.09 *
12,926.09 *
Crows - Equipment
4,368.74 *
4,368.74 *
Traveltown - Buildings
20,505.63 *
20,505.63 *
20,505.63 *
Traveltown - Equipment
6,918.04 *
6,918.04 *
7,298.58 *
Tearoom Motel - Equipment
0
0
0
Tearoom Motel - Building
0
0
0
All State Motel - Equipment
0
0
0
All State Motel - Buildings
0
0
0
City Motel - Equipment
0
0
0
City Motel - Building (40
0
0
0
units)
City Motel - Building (20
0
0
0
units)
Total Assets
$138,854.54
$153,210.57
$146,871.48
LIABILITIES AND NET WORTH
Reserve for depreciation: Tearoom Motel - Equipment
0
0
0
Tearoom Motel - Building
0
0
0
All State Motel - Equipment
0
0
0
All State Motel - Building
0
0
0
City Motel - Equipment
0
0
0
City Motel - Building
0
0
0
Traveltown - Buildings &
$ 28,039.64 *
$ 30,844.10 *
$ 19,004.95 *
Equipment
Notes Payable
700.00 *
0
0
Total Liabilities
$ 28,739.64 *
$ 30,844.10 *
$ 19,004.95 *
Summary: Total assets
$138,854.54
$153,210.57
$146,871.48
Total liabilities
28,739.64 *
30,844.10 *
19,004.95
Net worth
$110,114.90
$122,366.47
$127,866.53
Net worth prior year
110,114.90
122,366.47
Net worth increase
12,251.57
$ 5,500.06
Add personal living expenses
$ 2,230.00 *
2,754.27
Deduct nontaxable portion
(1,123.62) *
(402.84) *
capital gains
Deduct income tax refund
0
0
Add income tax paid
540.37 *
0
Adjusted gross income
$ 13,898.32
$ 7,851.49
corrected
Adjusted gross income
(1,570.01)
$ 3,269.48
reported
Understatement - Adjusted
$ 15,468.33
$ 4,582.01
gross income
*282 COMPUTATION OF INCOME BY NET WORTH PLUS NONDEDUCTIBLE
EXPENDITURES METHOD
ASSETS
12-31-49
12-31-50
12-31-51
12-31-52
Cash on hand
$ 16,622.51
$ 19,309.44
$ 22,007.62
$ 26,142.27
Cash in Bank: Citizens National Bank -
3,219.25 *
4,970.48 *
2,188.12 *
1,992.31 *
Checking
Citizens National Bank -
140.03 *
3,165.71 *
4,577.63 *
6,087.89 *
Savings
Bank of White Sulphur
172.42 *
174.14 *
175.88 *
177.68 *
Springs - Savings
United States Savings Bonds
79,180.00 *
79,930.00 *
79,930.00 *
43,040.00 *
Notes Receivable
15,000.00 *
13,800.00 *
15,100.00 *
13,900.00 *
Automobiles
900.00 *
900.00 *
2,500.00 *
2,500.00 *
Nondepreciable real estate
10,094.25 *
11,230.90 *
13,980.90
43,680.90
Depreciable real estate: Mountain Tavern - Buildings
Crows - Buildings
Crows - Equipment
Traveltown - Buildings
20,505.63 *
20,505.63 *
20,505.63 *
20,505.63 *
Traveltown - Equipment
7,298.58 *
7,298.58 *
7,298.58 *
7,298.58 *
Tearoom Motel - Equipment
1,685.00
1,685.00
1,835.00
1,835.00
Tearoom Motel - Building
22,900.00
22,900.00
22,900.00
22,900.00
All State Motel - Equipment
0
0
0
0
All State Motel - Buildings
0
0
0
0
City Motel - Equipment
0
0
1,000.00
16,180.25
City Motel - Building (40
0
0
26,595.00
88,650.00
units)
City Motel - Building (20
0
0
0
0
units)
Total Assets
$177,717.67
$185,869.88
$220,594.36
$294,890.51
LIABILITIES AND NET WORTH
Reserve for depreciation: Tearoom Motel - Equipment
$ 84.25
$ 252.75
$ 428.75
$ 612.25
Tearoom Motel - Building
343.50
1,030.50
1,717.50
2,404.50
All State Motel - Equipment
0
0
0
0
All State Motel - Building
0
0
0
0
City Motel - Equipment
0
0
50.00
909.01
City Motel - Building
0
0
0
1,329.75
Traveltown - Buildings &
21,084.29
23,061.86
25,039.43
26,597.63
Equipment
Notes Payable
0
0
0
4,000.00 *
Total Liabilities
$ 21,512.04
$ 24,345.11
$ 27,235.68
$ 35,853.14
Summary: Total assets
$177,717.67
$185,869.88
$220,594.36
$294,890.51
Total liabilities
21,512.04
24,345.11
27,235.68
35,853.14
Net worth
$156,205.63
$161,524.77
$193,358.68
$259,037.37
Net worth prior year
127,866.53
156,205.63
161,524.77
193,358.68
Net worth increase
$ 28,339.10
$ 5,319.14
$ 31,833.91
$ 65,678.69
Add personal living expenses
2,130.10 *
3,163.17
3,137.33
2,734.00
Deduct nontaxable portion
0
0
0
0
capital gains
Deduct income tax refund
0
0
0
0
Add income tax paid
91.00 *
74.30 *
216.85 *
0
Adjusted gross income
$ 30,560.20
$ 8,556.61
$ 35,188.09
$ 68,412.69
corrected
Adjusted gross income
$ 2,288.25
3,467.65
23,237.92
26,950.48
reported
Understatement - Adjusted
$ 28,,803.97
gross income
*283 COMPUTATION OF INCOME BY NET WORTH PLUS NONDEDUCTIBLE
EXPENDITURES METHOD
ASSETS
12-31-53
12-31-54
12-31-55
Cash on hand
$ 33,341.12
$ 40,659.97
$ 48,261.87
Cash in Bank: Citizens National Bank -
2,152.96 *
301.84 *
6,896.94 *
Checking
Citizens National Bank -
7,588.36 *
9,085.18 *
10,666.53
Savings
Bank of White Sulphur
0
0
0
Springs - Savings
United States Savings Bonds
43,040.00 *
43,040.00 *
43,040.00 *
Notes Receivable
18,700.00 *
17,500.00 *
10,300.00 *
Automobiles
2,500.00 *
2,500.00 *
2,500.00 *
Nondepreciable real estate
44,180.90
46,802.90
48,302.90
Depreciable real estate: Mountain Tavern - Buildings
Crows - Buildings
Crows - Equipment
Traveltown - Buildings
20,505.63 *
20,505.63 *
9,834.00 *
Traveltown - Equipment
7,298.58 *
7,298.58 *
3,599.51 *
Tearoom Motel - Equipment
1,835.00
1,835.00
1,835.00
Tearoom Motel - Building
22,900.00
22,900.00
22,900.00
All State Motel - Equipment
0
280.00
8,599.64
All State Motel - Buildings
0
28,225.00
56,450.00
City Motel - Equipment
18,522.43
26,822.43
26,822.43
City Motel - Building (40
88,650.00
88,650.00
88,650.00
units)
City Motel - Building (20
17,952.81
32,201.40
46,450.00
units)
Total Assets
$329,167.79
$388,607.93
$435,108.82
LIABILITIES AND NET WORTH
Reserve for depreciation: Tearoom Motel - Equipment
$ 795.75
$ 979.25
$ 1,162.75
Tearoom Motel - Building
3,091.50
3,778.50
4,465.50
All State Motel - Equipment
0
14.00
457.98
All State Motel - Building
0
0
846.75
City Motel - Equipment
2,644.14
4,911.38
7,593.62
City Motel - Building
3,989.25
6,648.75
10,005.00
Traveltown - Buildings &
27,355.09
27,731.42
13,668.48
Equipment
Notes Payable
16,000.00 *
6,000.00 *
11,000.00 *
Total Liabilities
$ 53,875.73
$ 50,063.30
$ 49,200.08
Summary: Total assets
$329,167.79
$388,607.93
$435,108.82
Total liabilities
53,875.73
50,063.30
49,200.08
Net worth
$275,292.06
$388,544.63
$385,908.74
Net worth prior year
259,037.37
275,292.06
338,544.63
Net worth increase
$ 16,254.69
$ 63,252.57
$ 47,364.11
Add personal living expenses
2,878.87 *
3,073.31 *
3,038.73 *
Deduct nontaxable portion
0
0
$ (2,862.50)
capital gains
*
Deduct income tax refund
0
0
(1,300.00) *
Add income tax paid
16,445.73 *
1,963.70 *
688.00 *
Adjusted gross income
$ 35,579.29
$ 68,289.58
$ 46,928.34
corrected
Adjusted gross income
12,366.47
584.06
3,124.37
reported
Understatement - Adjusted
gross income
*284 A part of the deficiency for each of the years 1947 through 1955 was due to fraud with intent to evade tax. The Federal income tax returns filed by petitioner for the years 1947 through 1955 were false or fraudulent with intent to evade tax. Opinion Respondent's net worth computation indicates understatements in petitioner's adjusted gross income in each of the years 1947 through 1955. The parties have stipulated that they are in agreement on many of the items appearing in the computation, and the main items which are still in dispute are (1) opening cash as of December 31, 1946 and cash on hand as of December 31, 1947 through 1955; (2) cost of construction of the Tea Room Motel (14 units), the City Motel (40 units and 20 units), and the All State Motel (24 units); and (3) the useful life of each of the motels and the amount of depreciation to be allowed for them in the years involved. There is also a dispute as to whether respondent properly capitalized certain legal fees incurred by petitioner in connection with the City Motel property and certain improvements to the City Motel property and the All State *285 Motel property. Petitioner attacks respondent's use of the net worth method. We hold respondent was justified in computing petitioner's income by means of a net worth method. Petitioner's books were entirely inadequate. Motel receipts were entered in the books from scraps of paper on which petitioner had merely written down the total daily receipts that he had taken in at the motel he operated. The record shows petitioner conducted much of his business by using his daily receipts to pay current expenditures and construction costs. Guest registration cards, cash register tapes and other supporting data for book entries were all destroyed after 10 days, making it impossible to verify book entries. We are satisfied respondent was justified in his use of the net worth method. Morris Lipsitz, 21 T.C. 917, affirmed 220 F. 2d 871. Petitioner testified that from 1921 until 1932 he was engaged in the illegal production and sale of whiskey and that the money he earned from this activity was buried by him from time to time during this period in jars, with some of the jars containing as much as $25,000; that he dug up most of the money beginning in 1942 and placed *286 it in safety deposit boxes; and that at the end of 1946 he had about $110,000 left. Petitioner admitted that he did not actually count the money in 1946 but that he counted it about five years later, in September 1951, and found that he had $75,000 on hand. Petitioner's witness, a certified public accountant whose firm prepared petitioner's returns for the years 1946 through 1952 and who also prepared a net worth statement covering the years 1947 through 1955, testified that he reconstructed the cash on hand as of the end of 1946 by the following technique: Q. You stated in calculating this, and I believe your base was at the end of the year 1950 when Mr. Carper stated he had $75,000. Now, what known items did you include to arrive at your cash on hand figure as at December 31, 1946? A. Going backward, he built a $10,000 motel in 1949 and the equipment amounted to $1,600, and the motel was around $8,800. In 1948, he acquired a lot in Lewisburg for approximately $7,000. In 1947, he loaned Mr. Ames $6,000. In 1947 he purchased $4,000 in Government bonds. It is obvious that this artificial reconstruction of an opening cash figure is as shaky as its starting point of $75,000 in 1951, *287 and as to this we have only the petitioner's uncorroborated testimony. There is no evidence that anyone saw this purported cash in 1951, when petitioner said he counted it, or at any time during the years 1947 through 1951. Petitioner was evasive on the stand and at times quite unresponsive to the questions put to him. His story of the buried glass jars was vague and rambling, full of inconsistencies, and it left this Court with the definite impression that it was an improvisation. At no time during the investigation did the petitioner mention to the revenue agents the existence of any buried glass jars. Nor did he do so when the respondent determined petitioner's tax liabilities for the years 1937 through 1944 by the use of a net worth statement. Examples of inconsistencies and confusion recur throughout petitioner's testimony about the glass jars. As to the amounts in jars, he testified that "when I got some on hand I'd say I buried two or three thousand dollars at a time and put it in the jars." Further on he testified that "when I'd get five thousand dollars or six thousand dollars on hand, why, I'd bury it." Still further he testified that "[some] of them jars had as much *288 as $25,000 in them." As to the place of burial, there is the following testimony: Q. Now, then, where did you bury these jars? A. At the old home place, on a little rise, up at the upper end of the lot, and under the springhouse below it, and also in a little orchard right on that hill. I buried most of it in the barn, and the rest of it I buried in the orchard. It is difficult to reconcile the last sentence with the one preceding it. At another time he testified "I buried it [four or five thousand dollars] under a cottage over there." As to the time when the money was removed from the ground, the petitioner testified at various times that (1) he dug up the money in 1942, (2) he dug it up from 1942 to 1945, (3) he dug up the last jar in 1946, and (4) he was still taking rotten money in jars out of the ground in 1952. Another conflict in his testimony is that he dug up the money in 1942 and did not bury it again after that, yet at another point he testified that he dug up some of the money, found it damaged, then changed it into new bills and reburied it. Again he testified that in 1942 he "counted it all" but further on he testified that he dug up the money gradually from "1942 *289 to 1945", so it would be difficult to have made any count in 1942. The following testimony also helps to obscure the time of counting: Q. Now, Mr. Carper, I don't think the record is clear as to how you dug this money up, when you dug it up, and when and where you exchanged it. Now, when did you dig this money up? A. When I commenced to buy war bonds in 1942. Q. How much did you dig up at that time? A. I don't know how many bonds I bought. I don't know how many bonds I bought in that year. Q. I believe you said previously, if I am not mistaken, in your testimony that you had $110,000 left after you bought war bonds in 1942, and is that what you said? A. I said - well, about that much. Q. How did you know exactly how much you had left if your money was buried? A. I didn't know exactly how much I did have until '51 when I counted all my money, and I only had $75,000 left, and I paid up for a lot, and I paid Ames, and I bought some more bonds, and I figured I had about that much. I don't know exactly how much I had. Q. The first time you dug money up, how much did you take out of the ground? A. I don't know how much was in them. I don't know how many bonds I bought.
*290 Q. How many jars did you remove in 1943? A. I don't know. Q. How many in 1943? A. I couldn't tell you that. It may be true that petitioner from 1921 to 1932 earned substantial income from the illegal production and sale of liquor. However, he testified that he ceased this activity in 1932, and it is reasonable to assume that over the period from 1932 through 1946 he made inroads on whatever money he had accumulated. The record shows that he constructed 11 tourist cabins in 1932 and 40 more in 1938, and although he testified he used lumber he already owned from a family sawmill, it is obvious he must have incurred some construction costs. He also used $75,000 of his "[liquor] money" in the early 1940's to buy United States Savings Bonds. There is testimony that he made trips to California and Florida. Finally, we note in the net worth statement in the prior investigation (1937-1944) that the asset "Cash on hand and in banks" shows a balance as of December 31, 1944 in the amount of $22,599.39. Petitioner testified that he paid $21,000 out of his liquor earnings on his tax liabilities arising from the investigation of the years 1937 through 1944, and the record indicates that *291 this amount was paid prior to 1947, which is the first year here involved. Consequently, the amount of petitioner's cash on hand and in banks as of December 31, 1944, as shown on the prior net worth statement, would be practically eliminated. We find, on the basis of the entire record, that the petitioner's testimony concerning the cash hoard buried in glass jars is completely without credibility, and we hold that petitioner is not entitled to an opening cash amount, as of January 1, 1947, in excess of the amount used by respondent in the net worth statement. Petitioner steadfastly refused throughout the investigation of his tax liabilities to divulge the amount of cash he had on hand during the period here involved. Instead, he insisted throughout that at the end of each of the years here involved he retained in cash an amount measured by his depreciation deduction for that particular year. In view of petitioner's extremely limited accounting knowledge, it is obvious from the testimony that he was merely regarding the depreciation figure as a rough measure of his cash on hand at the end of each year. Respondent therefore listed petitioner's cash on hand in the amount of $7,874.07 *292 as of December 31, 1946, and the revenue agent testified that this figure was "the depreciation as claimed on the income tax returns for the years 1945 and 1946." In the same fashion respondent determined the cash on hand as of December 31, 1947 through 1955. The revenue agent explained his computation as follows: Q. State to the Court the way you arrived at the cash on hand figure for the year 1947 and the following years. State your mechanics of computation or whatever you did to arrive at those figures for the various years there. A. Since Mr. Carper was insistent each and every time we had an interview with him or in the presence of us or his accountants, he insisted the depreciation on each year's tax returns was the only way he could ascertain the amount of cash on hand and that he retained such cash, so each of those years here, commencing with the year 1946, that comprises the years 1945 and '46 depreciation, and added to that figure for the year 1947 depreciation, we will get the sum total that is listed here in this exhibit for the year 1947. Each of those years would have the current depreciation on the income tax return of that respective year added to and carried *293 over, carried forward each year to get to Mr. Carper's cash on hand as he has insisted that he had, the way he has determined it. We think that respondent was justified, and in fact compelled, to adopt this approach. [3]
In the net worth statement prepared by the petitioner there is shown cash on hand as of December 31, 1946 through 1955 in the respective amounts of $103,481.83, $93,116.77, $89,816.43, $77,698.58, $75,000, $80,265.14, $58,298.88, $44,345, $13,298.81 and $14,273.58. As indicated earlier in the opinion, all of these items are built upon the $75,000 figure which petitioner testified he had on hand in 1951. For prior years the certified public accountant merely added back to this starting figure certain cash expenditures, and for subsequent years he deducted "known cash expenditures" to get the year-end cash on hand for 1951 and the remaining years here involved. We have held petitioner's testimony that he had $75,000 in 1951 is not worthy of belief. *294 Also in dispute are the construction costs of the Tea Room Motel, the City Motel and the All State Motel. It is evident that petitioner's books and records were not a reliable source of these costs and, in fact, petitioner's accountant in computing these costs was compelled to get information from third party records. It also appears that the accountant obtained some of this information, "which we did not have", from the revenue agent. The parties stipulated certain construction costs over the years 1949 through 1955 "to the extent the parties hereto could reach a joint agreement after investigation and examination of the records of the various businesses from which the petitioner was known to make purchases. The purchases shown * * * were represented by invoices or billings to petitioner by name. Purchases, if any, by petitioner where the invoices were made to cash rather than to him by name are not reflected in this statement." The total of these stipulated construction costs was $125,605.64 and petitioner's accountant prepared a breakdown of this total, allocating portions of it to the various motels. In addition, petitioner presented two witnesses who submitted their appraisals *295 of the motels. Respondent's witness, a revenue agent, testified as to his appraisal of the motels based upon his personal inspection of the properties. We summarize the evidence as to costs of construction submitted by the parties as follows: Breakdown of
Stipulated
Petitioner
Respondent
Amount
Witness A
Witness B *
Tea Room (14 Units)
$ 22,900
$ 8,824.84
$ 20,000
$ 24,021
$ 22,796
City Motel (40 Units)
88,650
60,101.30
62,500
60,675
63,261
City Motel (20 Units)
46,450
31,864.15
30,000
33,822
28,960
All State Motel (24
56,450
23,913.54
32,000
49,153
50,083
Units)
$214,450
$124,703.83
$144,500
$167,671
$165,100
Petitioner dealt extensively in cash and the record strongly suggests that even the most diligent inquires would not yield the true costs of petitioner's motels. Consequently, it would be idle to suppose that the petitioner's books, together with the information gained from third party sources (which have been stipulated), would represent all of the costs. We note, for instance, that according to the costs *296 gathered from these sources, the Tea Room Motel was constructed at a cost of $8,824.84, yet petitioner's own witness testified that the costs of this particular motel would be anywhere from $20,000 to about $24,000. Similarly, the stipulated cost of the All State Motel, according to these sources, is shown as $23,913.54, yet the petitioner's witnesses appraised this property anywhere from $32,000 to about $50,000. The stipulated amounts for the Tea Room and All State are clearly too low. We also feel the appraisals of petitioner's witnesses for the City Motel (40 units and 20 units), which roughly agree with stipulated amounts, are likewise too low. Respondent's witness, in appraising the motels took cognizance of such factors as (1) petitioner's personal supervision over construction of the motels which eliminated the cost of a general contractor and an architect; (2) the fact that petitioner performed some of the labor himself; (3) the use of old materials in the construction; and (4) the use of cheap materials in portions of the motels. On the other hand, this witness failed to consider additions to the motels made after 1955, and he incorrectly assumed that the upper story of *297 the 20 unit motel was heated. We hold, on the basis of the whole record, that the cost of construction for the motels was as follows: Tea Room Motel, $22,900; City Motel quoted (40 units), $80,000; City Motel (20 units), $40,000; and the All State Motel, $51,000. Also in dispute is the useful life of these motels for depreciation deduction purposes. Respondent determined that the motels have a useful life of 33 1/3 years, or a depreciation rate of 3 percent per year, which is the rate found in "Bulletin F" for apartments, dwellings and other buildings of cheap construction. Petitioner's witness gave the useful life of each motel as follows: Tea Room Motel, 20 to 25 years; All State Motel, 25 to 30 years; and City Motel, 20 to 25 years. Petitioner's witness did little more than recite these figures and we think that more is required to show that respondent's determination of the useful lives of the motels was incorrect. We sustain the respondent on this point. In the respondent's net worth statement there appears an increase in the asset "Nondepreciable Real Estate" in 1951 in the amount of $1,750. This represents land improvements to the City Motel consisting of a cinder block *298 retaining wall, a crushed stone surface for the parking area, and outside walks around the east part of the motel. Similarly, this same asset reflects an increase of $1,200 in 1954 representing ground improvements to the All State Motel property consisting of a cinder block retaining wall and a parking area surfaced with crushed stone. We see no reason to disturb these adjustments made by respondent. Petitioner appears to argue that these amounts represent creek gravel used as fill on two of the properties and that these amounts of fill have already been included in the construction costs of the motels. However, the testimony of the revenue agent establishes clearly that the amounts represent the improvements listed above, and not gravel fill, and we are satisfied from the evidence that there has been no duplication of costs. We sustain the respondent on this adjustment to the nondepreciable asset account. Petitioner incurred certain legal expenditures in 1953 and 1954 (in the total amount of $2,922) in litigation involving the property purchased by him in 1951 and which is the site of the City Motel. Respondent capitalized these items as part of the cost of the land, thus increasing *299 in those years the "Nondepreciable real estate" asset appearing on the net worth statement. It is evident from the pleadings in the litigation that the vendor of the land alleged that petitioner had made alterations in the deed prior to recording it and asked the court (1) to rescind the sale entirely or (2) in the alternative, compel petitioner to erect gasoline pumps on the property, which vendor alleged was an essential part of the sales agreement. The court decreed that the vendor was not entitled to relief. We believe that these legal costs of the petitioner come essentially within the well-established rule that legal fees and litigation expenses paid to defend or protect one's title to property are capital expenditures to be added to the cost of the property and are not currently deductible as expenses. Samuel Cohen, 24 T.C. 957. We sustain respondent on this issue. Respondent determined that petitioner was liable for additions to tax under section 293(b) of the Internal Revenue Code of 1939 and 6653(b) of the Internal Revenue Code of 1954, for the years 1947 through 1955. These sections provide for an addition to tax of 50 percent of the *300 deficiency where any part of such deficiency is due to fraud. The burden of proof to show fraud is on the respondent and it must be established by clear and convincing evidence. Arlette Coat Co., 14 T.C. 751. We have made adjustments to several items in the net worth statement, such as the costs of construction for the petitioner's motels. Our findings as to the motel costs are based upon petitioner's books, the information gathered from third party sources, and from the appraisal testimony offered in evidence by the respondent. However, even with our adjustments, the evidence shows clearly that petitioner grossly understated his income for the years 1947 through 1955, and we believe that these understatements were so regular and substantial that they establish a deliberate intention on his part to defraud the Government. The obvious incompleteness of the petitioner's books, the handling of a substantial portion of his business affairs in cash, and his obstructive tactics in the investigation are further indicia of a design to conceal the true facts regarding his taxable income and that the understatements were known to him. It is also of some significance that the *301 certified public accounting firm that prepared petitioner's income tax returns for the years 1947 through 1952 found it necessary to make third party inquiries to get more complete information, and that early in 1953 they found it necessary to file an amended return for 1951 showing an adjusted gross income of $23,237.92, whereas the original 1951 return showed an adjusted gross income of only $1,333.16. The accounting firm also prepared, about the same time, petitioner's 1952 return showing an adjusted gross income of $26,950.48. Following this the petitioner had his 1953, 1954 and 1955 returns prepared by someone else and those returns reported adjusted gross income of $12,366.47, $584.06 and $3,124.37, respectively. We have singled out some of the evidence of fraud, but we are mindful that the conclusion as to whether or not fraud exists depends upon the whole record. William W. Kellett, 5 T.C. 608. We hold on the entire record that a part of the deficiency for each of the years 1947 through 1955 was due to fraud with intent to evade tax. The above discussion will also suffice to support our finding that the returns filed by petitioner for the years 1947 through *302 1955 were false or fraudulent with intent to evade tax and hence those years were not barred by the statute of limitations. Section 276(a), Internal Revenue Code of 1939, section 6501(c), Internal Revenue Code of 1954. Respondent determined that petitioner was liable for additions to tax under section 294(d)(2) for the years 1947 through 1954 and under section 294(d)(1)(A) for the years 1947 through 1949. Respondent now concedes the additions to tax under section 294(d)(2) for the years 1947, 1948 and 1949. Section 294(d)(2) provides for an addition to tax where 80 percent of a taxpayer's tax exceeds his estimated tax for that year. The application of this section is automatic when its conditions are met. Petitioner merely states on brief that this section does not apply because there were no understatements of income for these years. We have found, to the contrary, that substantial understatements do exist, and on the basis of this record sustain the respondent's determination. We also sustain respondent's determination of liability under section 294(d)(1)(A) for the years 1947, 1948 and 1949. This section imposes liability where a *303 taxpayer fails to make and file a declaration of estimated tax unless such failure is due to reasonable cause. Petitioner's accountant testified that he prepared the declarations for 1948 and 1949 and delivered them to the petitioner. There is no evidence that these were ever filed with the respondent and, in fact, petitioner's attorney stated to the Court that he had "asked [petitioner] whether or not he filed personally the declarations for the years 1948 and 1949, and he stated he cannot remember whether he personally filed those or not." Moreover, there is nothing in the record to indicate that the failure to file was due to reasonable cause. We sustain the respondent on this issue. Decision will be entered under Rule 50. Footnotes
1. All section references are to the Internal Revenue Code of 1939, as amended, unless otherwise noted.↩
2. In respondent's original net worth computation the amounts of unreported adjusted gross income for the years 1947 through 1955 were shown as follows: $15,468.33, $5,053.78, $32,071.61, $5,096.74, $10,791.25, $42,974.42, $27,619.32, $59,420.26 and $44,254.05.↩
*. The parties have stipulated that these amounts are correct.↩
3. Petitioner at one point during the investigation indicated to the revenue agent that he had $1,000 at the end of each of the years 1948 through 1955, except for the year 1952 when he purportedly had $5,000.↩
*. This witness made two separate appraisals based upon different appraisal manuals.↩